UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

DEXTER MASTOWSKI,

               Petitioner,

    -vs-

SUPERINTENDENT

               Respondent.

**DECISION AND ORDER**
**No. 10-CV-0445T**

_____

## I.   Introduction

Petitioner Dexter Mastowski ("Petitioner"), through counsel,[1] has filed a timely petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging the constitutionality of his custody pursuant to a judgment entered August 19, 2003, in New York State, County Court, Ontario County (Hon. Craig J. Doran), convicting him, after a jury trial, of Assault in the First Degree (N.Y. Penal Law ("Penal Law") § 120.10(3) (depraved indifference assault). Petitioner was sentenced to a determinate prison term of seventeen years, plus five years of post-release supervision.

For the reasons stated below, habeas relief is denied and the petition is dismissed.

---

[1]

    On May 28, 2010, Petitioner, acting *pro se*, filed a petition for a writ of habeas corpus. Dkt. No. 1. On July 23, 2010, a Notice of Appearance was filed by attorney Estelle Jana Roond on behalf of Petitioner. Dkt. No. 8. Through counsel, Petitioner subsequently filed a supplemental memorandum of law in support of his habeas petition (Dkt. No. 20) and a Reply/Response (Dkt. No. 31).

## II.  Factual Background and Procedural History

### A.   Introduction

An Ontario County Grand Jury indicted Petitioner with one count of Assault in the First Degree (depraved indifference assault).  The charges arose from an incident that occurred on October 12, 2002, in which Petitioner violently shook his two-and-a-half month old daughter Emily ("Emily" or "the victim"), causing traumatic injuries to her.

### B.   The __Huntley__ Hearing

### 1.   The People's Case

On October 12, 2002, Scott Upchurch, the Chief of Police in Clifton Springs, New York, was informed of a serious physical injury to a two-month-old infant.  The information was received from the Child Abuse Hotline, and Chief Upchurch was informed that the child was located at Strong Memorial Hospital.  The following day, Chief Upchurch went to the hospital to investigate.  Chief Upchurch spoke separately with Petitioner alone in a waiting room inside the hospital.  Hr'g Mins. [H.M.] 4-5.  Petitioner was not overly responsive and gave only "yes" or "no" answers.  H.M. 5.  Chief Upchurch asked Petitioner to write down the events leading up to Emily's admission to the hospital, and Petitioner voluntarily agreed to do so.  H.M. 6.

Petitioner then agreed to give a second written statement after being advised of his __Miranda__ warnings.  H.M. 6-9.  At no time

during the interview was Petitioner told that he was under arrest, nor was he verbally or physically threatened in any way.  H.M. 9-10.  After Petitioner completed the second statement, they took a break from questioning.  When Chief Upchurch asked to speak with Petitioner after the break, Petitioner informed Chief Upchurch that he had spoken with his brother and was advised to seek counsel. H.M. 11.  At that point, Chief Upchurch stopped talking to Petitioner.  H.M. 12.

David Smith, of the Ontario County Sheriff's Department, testified that he was Petitioner's uncle, but because the two were close in age, they referred to each as brothers.  H.M. 18-19. Smith called Petitioner at Strong Memorial Hospital on the telephone on October 13, 2002 after Petitioner had spoken with Chief Upchurch.  H.M. 21.  Smith, aware of allegations of shaken baby syndrome, told Petitioner not to speak with the police and to hire an attorney.  H.M. 23.

Also on October 12, 2002, after Petitioner spoke with Chief Upchurch, Janice Mangini ("Mangini"), a case worker for the Ontario County Department of Social Services, spoke with Petitioner "in one of the interview rooms at the hospital on the same floor that the baby was in" regarding Emily's injuries.  H.M. 37-38. Petitioner never indicated that he was unwilling to speak with Mangini.  H.M. 44.  On October 15, 2002, Alisha Testa ("Testa"), also of the Ontario County Department of Social Services, was

assigned to the case and spoke with Petitioner and his wife at Strong Memorial Hospital.  H.M. 51-52.

### 2.    The Defense

Petitioner testified that he spoke to Chief Upchurch in a locked interview room and that Upchurch told Petitioner that if he admitted doing harm to Emily, she would be able to get better medical care.  H.M. 75-76.  Petitioner also testified that Upchurch told him that if he gave a statement, a court would be more lenient with him.  H.M. 76.  Petitioner further stated that Chief Upchurch did not advise him of his <u>Miranda</u> rights until he had written both of his statements and Upchurch described the warnings as legal "mumbo jumbo."  H.M. 78.

### 3.    The Suppression Decision

The hearing court held that Petitioner was not in custody when he spoke with Chief Upchurch and that the questions asked were investigatory rather than accusatory.  The hearing court found that Petitioner's written statements were admissible.  The hearing court also held that the conversation between Petitioner and Deputy Smith was personal and not the result of police interrogation. Regardless, the hearing court held that Petitioner was not in custody because the conversation took place over the phone. Accordingly, the court denied Petitioner's request to suppress his statements to Deputy Smith.  <u>See</u> Resp't Ex. A.

The hearing court also determined that the statements Petitioner made to caseworkers Mangini and Testa were admissible because they were voluntarily made and the child protective service case workers were not law enforcement officials.  See Resp't Ex. A.

**C.   The Trial**

**1.   The People's Case**

On October 12, 2002, registered nurse Barbara Mellor-Conley, Dr. Katherine O'Hanlon, and Dr. Laura Kierston Church were working in the emergency room at FF Thompson Hospital in Canandaigua, New York.  Trial Trans. [T.T.] 341-342, 371, 480-482.  At around 2:00 p.m., Petitioner and his wife brought in their two-month-old daughter, Emily.  The baby appeared to have either a head injury or a neurological problem and was pale and bluish.  The baby's eyes were both deviated to the right and her right arm and leg were stiff.  T.T. 343-344, 351, 372-373, 482, 486.  The soft spot on Emily's head was bulging, indicating brain swelling or bleeding.  T.T. 487.  Emily was given oxygen and her natural color began to return.  T.T. 349-350.  She was then intubated, and nine minutes later she went into cardiac arrest.  T.T. 354.  After thirty seconds of chest compressions, Emily's heart began to beat again.  T.T. 355.

Nurse Mellor-Conley and Dr. O'Hanlon asked Petitioner if anything had happened to the baby or if Petitioner had shaken the baby and Petitioner said "no."  T.T. 357, 381-384.  Emily was then

airlifted to Strong Memorial Hospital in Rochester, New York. T.T. 358, 377-378.  Nurse Mellor-Conley then called the New York State Child Abuse Hotline and reported Emily's injuries.  T.T. 358.

Later in the afternoon, Drs. Heidi Connelly and Karen Powers, who specialized in pediatric intensive care at Strong Memorial Hospital, began to treat Emily.  In addition to the previously noted conditions, the doctors also noted that Emily's eyes had massive retinal hemmorrhages.  T.T. 581-583, 586, 644, 647-648.  An initial CAT scan revealed that there was severe swelling in Emily's brain.  A later scan showed that the swelling had subsided, but there was a significant subdural hematoma composed of fresh blood. T.T. 644, 674-675.

Again, both Petitioner and his wife denied knowing what had caused Emily's injuries.  With the exception of some vomiting after receiving her first vaccines two weeks earlier, Emily's parents described Emily as a healthy and normal infant.  T.T. 587, 595-596, 608, 648-649, 683-684.  Dr. Powers called Emily's regular pediatrician, Dr. Kristen Franks-Bissell, for a medical history. According to Dr. Franks-Bissell, Emily did not have any medical problems and appeared to be a normal, healthy baby.  T.T. 438-439. Dr. Franks-Bissell gave Emily her vaccinations in late September. T.T. 485.  On October 2, 2002, Petitioner called Dr. Franks-Bissell because Emily was vomiting.  T.T. 449-450.  Petitioner was directed

to monitor Emily and call back if the condition did not improve. T.T. 451.

Drs. Powers and Connelly performed numerous tests on Emily while she was at Strong Memorial Hospital to rule out potential causes for her condition.  T.T. 582, 586, 589-590, 643-644.  They were able to rule out metabolic and blood disorders, asphyxia, infectious diseases and viruses, and congenital defects.  T.T. 585-586, 597-598, 625, 650-651, 653, 660, 693-94.  Having ruled out these potential causes, the doctors concluded that Emily had been violently shaken, causing massive retinal hemorrhages, severe swelling of her brain, and a massive subdural hematoma that resulted in severe neurological injury.  T.T. 581-583, 598-602, 615, 623-624, 626, 648-649, 651, 653, 656-57.  Dr. Connelly also reported the situation to Child Protective Services.  T.T. 596-598.

The following day, caseworker Mangini and Chief Upchurch went to Strong Memorial to investigate the reports of child abuse. T.T. 496-497, 560.  At about noon, Chief Upchurch spoke to Petitioner alone in a conference room in the pediatric care unit. Chief Upchurch asked Petitioner to write down what had happened on October 12, 2002, prior to bringing Emily to the hospital. T.T. 498-500, 516-517.  Petitioner wrote that in the morning Emily had been fussy after her feeding and that he had walked around with her, bouncing her up and down in an effort to calm her down. T.T. 503.  Petitioner wrote that he was frustrated and "not

realizing it" had bounced Emily "a little more than necessary." T.T. 503-504.  Petitioner wrote that he was "unknowingly bouncing [Emily] too hard" and that when she woke up later, she was not very responsive so he and his wife called the doctor and brought Emily to the hospital.  T.T. 504.

After Petitioner completed his written statement, Chief Upchurch asked him if he would give another written statement to clarify some of the information he had given.  T.T. 504, 517. Petitioner was read his <u>Miranda</u> rights and agreed to give a second written statement.  T.T. 504-507.  Petitioner then confirmed that he had "bounced" Emily "very hard" at around 9:00 a.m. and that he knew "for sure" that it was the cause of Emily's injuries. T.T. 509-510.

Caseworker Mangini spoke with Petitioner next and again admitted that he had roughly bounced Emily.  T.T. 562.  Petitioner stated that he was frustrated and just wanted Emily to stop fussing and he "unintentionally bounced her too hard."  T.T. 563.  When Emily finally calmed down, he put her in her bassinet and waited for his wife to come home.  When he and his wife noticed that Emily's pupils were dilated, they sought medical attention. T.T. 564.

Smith testified that he was Petitioner's uncle, but the two were close in age and raised in the same household as brothers. Deputy Smith heard about Petitioner's situation and called the

hospital on October 13, 2002.  T.T. 521-526.  Smith told Petitioner not to speak to the police any further and to hire a lawyer. T.T. 528.  Petitioner told Smith that he had told Chief Upchurch that he had bounced Emily.  Deputy Smith asked Petitioner whether he had gotten frustrated and shook Emily "hard," to which Petitioner responded, "[t]hat's what happened."  T.T. 529, 534, 536.

Two days later, on October 15, 2002, caseworker Testa went to the hospital to speak with Petitioner and his wife.  T.T. 400-409. Petitioner stated that he was primarily in charge of caring for the children over the weekend preceding this incident and that, in general, he was the primary caregiver.  T.T. 414-415.  Petitioner told Testa that he thought Emily's condition could have been caused by her being hit in the head with the spinning mobile on her bassinet.  T.T. 412-413.  Petitioner also told Testa that a nurse suggested that Emily might have had viral meningitis.  T.T. 409. Testa was in the room when Dr. Lenane told Petitioner that Emily's injuries were not caused by something falling on her, but rather that Emily had suffered severe trauma.  T.T. 417-418.  Testa overheard Petitioner tell Dr. Lenane that on October 11, 2002, Emily was not eating well and was sleepy.  The following day, Petitioner stated that Emily had to be awakened in the morning to eat, which was unusual.  T.T. 421.  Later that same morning, Petitioner stated that Emily began to get fussy and in the

afternoon, when Petitioner went to get Emily dressed and ready, he noticed something was wrong and she was not acting like herself. T.T. 423.   Petitioner then called the doctor, and Petitioner and his wife took Emily to the hospital.   T.T. 424.

The following day on October 16, 2002, Testa returned to the hospital and encountered Petitioner in the pediatric care unit. Petitioner told Testa that the hospital staff no longer believed that Emily suffered shaken baby syndrome, but rather that she may have turned her head on a pillow and suffocated.   T.T. 425-426.

When Emily left Strong Memorial Hospital, she was in a vegetative state and had minimal brain activity.   T.T. 662-663.   On July 18, 2003, only weeks before trial, Emily was being treated for long-term care at Monroe Community Hospital.   T.T. 662, 704.   State Police Investigator Christopher Baldwin visited Emily and found her sitting in a stroller-like wheelchair.   T.T. 704.   Investigator Baldwin testified that Emily's extremities were tightened and her hands were clenched.   She did not appear conscious or responsive. T.T. 704-705.

### 2.   The Defense's Case

Petitioner and his wife both testified that on September 27, 2002, they took Emily to the doctor for her two month check-up.   At that time, Emily received several vaccinations.   T.T. 730, 920-921. Two days later, Emily began vomiting and not acting like her normal self.   T.T. 730, 922-923.   A couple of days later, Petitioner

called the doctor and was told to monitor Emily and call back if the symptoms worsened.  T.T. 924.

On October 11, 2002, Kristi went to work and returned home around 4:00 p.m.  When Kristi arrived home, Emily was asleep. Kristi then went out with a friend at 5:00 p.m. and did not return until 10 or 11:00 p.m.  T.T. 735-736, 930-931.  Petitioner testified that he went to sleep at 9:30 or 10:00 p.m., and slept through the night.  T.T. 931.  The following morning Kristi left for work at 7:00 a.m.  T.T. 736, 737, 932.

During the day, Petitioner tried to feed Emily, but she only consumed about half her formula.  Petitioner testified that she appeared uncomfortable and he tried to soothe her by carrying her around, rocking her, swaddling her, and playing music.  Nothing seemed to comfort Emily and she continued to "whimper."  T.T. 934-936.  Eventually, Emily quieted down.  T.T. 938.

Kristi returned from work at around noon and she discovered that Emily was stiff and her eyes were dilated and fixed in one direction.  T.T. 738-740, 938-939.  Petitioner called the doctor and they then rushed Emily to the hospital.  T.T. 739-740, 940. Petitioner admitted making the written statements to Officer Upchurch, but stated that he was confused and felt pressured by the situation.  T.T. 955-956.  Petitioner denied shaking Emily or otherwise causing her injuries.  T.T. 967.

Eugene Buttram ("Buttram"), a doctor of family and environmental medicine at the Woodland Healing Research Center in Quakertown, Pennsylvania, testified that Emily could have suffered a reaction to the vaccinations that she received, which may have caused her brain to suffer hemorrhagic encephalitis.  T.T. 829, 835.  As a result, Emily's brain could have swelled and caused bleeding.  T.T. 830.  Buttram explained that the theory was "virtually unexplored," but dealt with vitamin C deficiencies. T.T. 831-832.  Buttram admitted, on cross-examination, he was not board-certified in any field and that he had not reviewed any of Emily's x-rays, MRIs, or CAT scans.  T.T. 852-853.  On cross-examination, Buttram also admitted that many of his theories had not been proven in scientific studies and most were rebuked by respected medical journals.  T.T. 870-892.  Some of Buttram's practices, such as Chelation therapy, had been rebuked by FDA Consumer Magazine as one of the top ten health frauds in America. T.T. 845-846.  In the mid-1990s, Buttram was charged by the United States Attorney's Office for fraudulently billing Medicare patients.  He paid over $50,000 in restitution and a $10,000 fine. T.T. 849.

### 3.  Verdict and Sentence

On August 1, 2003, Petitioner was found guilty as charged and subsequently sentenced to a determinate term of seventeen years

-12-

imprisonment, to be followed by five years of post-release supervision.  T.T. 1155-57; Sentencing Mins. [S.M.] 20.

### D.    Petitioner's Direct Appeal

On February 3, 2006, the Appellate Division, Fourth Department unanimously affirmed Petitioner's judgment of conviction, and leave to appeal was denied.  <u>People v. Mastowski</u>, 26 A.D.3d 744 (4th Dep't 2006) (Resp't Ex. D); <u>lv. denied</u>, 6 N.Y.3d 850 (2006) (Resp't Ex. F).  On June 7, 2006, Petitioner submitted a *pro se* motion for reconsideration, which was denied on August 4, 2006.  <u>See</u> Resp't Ex. H.

### E.    Collateral Relief

### 1.    Petitioner's First Motion to Vacate

On October 2, 2007, Petitioner filed a motion to vacate his judgment of conviction, pursuant to N.Y. Crim. Proc. Law ("CPL") § 440.10, on the following grounds: (1) insufficiency of the evidence; (2) ineffective assistance of trial counsel; and (3) newly-discovered evidence.  <u>See</u> Resp't Ex. I.  On November 21, 2007, the Ontario County Court denied the motion on procedural grounds.  <u>See</u> Resp't Ex. L.  Petitioner moved for re-argument, which was denied on January 18, 2008.  <u>See</u> Resp't Exs. M, N.

On December 13, 2007, Petitioner sought leave to appeal the denial of his motion in the Appellate Division, Fourth Department, which was granted on April 21, 2008.  <u>See</u> Resp't Ex. R.  On June 5, 2009, the Appellate Division, Fourth Department unanimously

affirmed the court's decision denying Petitioner's motion to vacate the judgment.  See Mastowski, 63 A.D.3d 1589 (4th Dep't 2009) (Resp't Ex. U).

On June 11, 2009, Petitioner, through counsel, submitted a leave application in the New York Court of Appeals.  See Resp't Ex. V.  Petitioner submitted a *pro se* supplemental leave application on July 5, 2009.  See Resp't Ex. W.  On July 29, 2009, the New York Court of Appeals denied Petitioner's leave application.  See Mastowski, 12 N.Y.3d 927 (2009) (Resp't Ex. X). On August 28, 2009, Petitioner submitted a *pro se* motion for reconsideration to the New York Court of Appeals, which was denied on October 8, 2009.  See Resp't Exs. Y, Z.

**2.   Petitioner's Second Motion to Vacate**

On September 17, 2009, Petitioner filed a motion to argue/renew his previous motion to vacate in which he argued that his constitutional right to confront witnesses was violated when one of the doctors who testified against him relied on hearsay. See Resp't Ex. AA.  The Ontario County Court construed this motion as a second CPL § 440.10 motion, and denied it on procedural grounds on November 15, 2009.  See Resp't Exs. DD.  Petitioner sought leave to appeal the denial to the Appellate Division, Fourth Department, which was denied on April 14, 2010.  Thereafter, Petitioner sought leave to appeal in the New York Court of Appeals,

-14-

and, on June 15, 2010, the New York Court of Appeals dismissed the application.  See Resp't Exs. GG, HH, II.

### F.   The Habeas Corpus Petition

On May 20, 2010, Petitioner, acting *pro se*, filed the instant habeas corpus petition, wherein he seeks relief on the following grounds: (1) the trial court's failure to suppress his statements violated his right against self-incrimination; (2) ineffective assistance of trial counsel; (3) prosecutorial misconduct; (4) the court improperly failed to give a circumstantial evidence charge; (5) the depraved indifference element of the assault charge was unconstitutionally vague and violated Petitioner's rights to equal protection and due process; (6) the evidence was legally insufficient; and (7) the sentence was harsh and excessive.  See Pet. ¶22, Grounds One-Seven (Dkt. No. 1); Supplemental Memo. of Law (Dkt. No. 20); Reply (Dkt. No. 31).

## III. General Principles Applicable to Habeas Review

### A.   The AEDPA Standard of Review

Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a federal court may grant habeas relief to a state prisoner only if a claim that was "adjudicated on the merits" in state court "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or if it "was based on an

unreasonable determination of the facts in light of the evidence presented in the state court proceeding." § 2254(d)(2).  A state court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 413 (2000).  The phrase, "clearly established Federal law, as determined by the Supreme Court of the United States," limits the law governing a habeas petitioner's claims to the holdings (not *dicta*) of the Supreme Court existing at the time of the relevant state-court decision. Williams, 529 U.S. at 412; accord Sevencan v. Herbert, 342 F.3d 69, 73-74 (2d Cir. 2002), cert. denied, 540 U.S. 1197 (2004).

A state court decision is based on an "unreasonable application" of Supreme Court precedent if it correctly identified the governing legal rule, but applied it in an unreasonable manner to the facts of a particular case. Williams, 529 U.S. at 413; see also id. at 408-10.  "[A] federal habeas court is not empowered to grant the writ just because, in its independent judgment, it would have decided the federal law question differently." Aparicio v. Artuz, 269 F.3d 78, 94 (2d Cir. 2001).  Rather, "[t]he state court's application must reflect some additional increment of incorrectness such that it may be said to be unreasonable." Id.

This increment "need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000) (internal quotation marks omitted).

Under AEDPA, "a determination of a factual issue made by a State court shall be presumed to be correct.  The [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); see also Parsad v. Greiner, 337 F.3d 175, 181 (2d Cir. 2003) ("The presumption of correctness is particularly important when reviewing the trial court's assessment of witness credibility."), cert. denied sub nom. Parsad v. Fischer, 540 U.S. 1091 (2003).  A state court's findings "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

### B.    Exhaustion Requirement

"An application for a writ of habeas corpus on behalf of a person in custody pursuant to a judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State. . . ." 28 U.S.C. § 2254(b)(1)(A); see, e.g., O'Sullivan v. Boerckel, 526 U.S. 838, 843-44 (1999); accord, e.g., Bossett v. Walker, 41 F.3d 825, 828 (2d Cir.1994), cert. denied, 514 U.S. 1054 (1995).  "The exhaustion

requirement is not satisfied unless the federal claim has been 'fairly presented' to the state courts." <u>Daye v. Attorney General</u>, 696 F.2d 186, 191 (2d Cir. 1982) (*en banc*), <u>cert. denied</u>, 464 U.S. 1048 (1984).

### C.   The Adequate and Independent State Ground Doctrine

A procedural default generally bars a federal court from reviewing the merits of a habeas claim. <u>Wainwright v. Sykes</u>, 433 U.S. 72 (1977). Federal habeas review is prohibited if a state court rests its judgment on a state law ground that is "independent of the federal question and adequate to support the judgment." <u>Cotto v. Herbert</u>, 331 F.3d 217, 238 (2d Cir. 2003) (quoting <u>Coleman v. Thompson</u>, 501 U.S. 722, 729 (1991)); <u>accord</u> <u>Jones v. Stinson</u>, 229 F.3d 112, 117 (2d Cir. 2000). A state procedural bar qualifies as an "independent and adequate" state law ground where "'the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar.'" <u>Levine v. Comm'r of Corr. Servs.</u>, 44 F.3d 121, 126 (2d Cir. 1995) (quoting <u>Harris v. Reed</u>, 489 U.S. 255, 262 (1989)). A state procedural rule will be adequate to preclude habeas review if it is "firmly established and regularly followed," unless the state rule is "exorbitant." <u>Lee v. Kemna</u>, 534 U.S. 362, 376 (2002) (quoting <u>James v. Kentucky</u>, 466 U.S. 341, 348 (1984)).

A federal court may review a claim, notwithstanding the petitioner's default, if he "can demonstrate cause for the default

and actual prejudice as a result of the alleged violation of federal law." Coleman, 501 U.S. at 750; see also Levine, 44 F.3d at 126; Grey v. Hoke, 933 F.2d 117, 121 (2d Cir. 1991). A petitioner may establish cause by pointing to "some objective factor external to the defense [that] impeded counsel's efforts to comply with the State's procedural rule." Murray v. Carrier, 477 U.S. 478, 488 (1986); accord Coleman, 501 U.S. at 753. A petitioner suffers actual prejudice if the outcome of the case would likely have been different had the alleged constitutional violation not occurred. See Reed v. Ross, 468 U.S. 1, 12 (1984). Alternatively, even if the petitioner is unable to show cause and prejudice, the court may consider the claim if he can demonstrate that failure to do so will result in a "fundamental miscarriage of justice." Coleman, 501 U.S. at 750.

**IV. Petitioner's Claims**

**1.  Trial Court Erred in Failing to Suppress Petitioner's Statements**

Petitioner argues, as he did on direct appeal, that the hearing court erred in failing to suppress his statements to the police because his right against self-incrimination was violated. Petitioner also claims that his statements to the caseworkers should have been suppressed as the fruit of the poisonous tree. See Pet. ¶22, Ground One; Supplemental Mem. of Law at 2-5. The Appellate Division, Fourth Department rejected this claim on the merits, finding that:

> [c]ontrary to the contention of defendant,
> County Court did not err in denying his motion
> to suppress his statement to the Chief of
> Police of Clifton Springs, child protective
> caseworkers, and close friend who is an
> Ontario County Sheriff's deputy. Defendant
> was not in custody when he made the statements
> and, in any event, defendant's right to
> counsel and privilege against self-
> incrimination were not implicated by the
> statements by defendant to child protective
> caseworkers.

Mastowski, 26 A.D.3d at 745 (internal citations omitted). As

discussed below, this claim is meritless.

While the voluntariness of a habeas petitioner's confession is

a question of law entitled to de novo review by a federal court,

Miller v. Fenton, 474 U.S. 104, 112 (1985), the state court's

factual findings "shall be presumed to be correct" in a federal

habeas corpus proceeding. 28 U.S.C. § 2254(e)(1). This presumption

applies to facts, such as the "length and circumstances of [an]

interrogation" that underlie a state court's legal ruling. Id. at

112, 117; see also Thompson v. Keohane, 516 U.S. 99 (1995)

(voluntariness of a confession is a question of law; findings

regarding "what happened" are entitled to presumption of

correctness).

Warnings pursuant to Miranda v. Arizona, 384 U.S. 436 (1966),

are required prior to the interrogation of a suspect who is in

custody. Custodial interrogation is "questioning initiated by law

enforcement officers after a person has been taken into custody or

otherwise deprived of his freedom of action in any significant

way." Id.; see also Dickerson v. United States, 530 U.S. 428 (2000) (reaffirming Miranda).  In determining whether a person is in custody, the reviewing court must determine "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." Thompson, 516 U.S. at 112.

Generally speaking, a suspect who has not been arrested is not considered "in custody" unless "law enforcement officials act or speak in a manner that conveys the message that they would not permit the accused to leave." Campaneria v. Reid, 891 F.2d 1014, 1021, n.1 (2d Cir. 1989).  Courts also consider whether "a reasonable person in the suspect's shoes would have understood that his detention was not likely to be 'temporary and brief' . . . [and] whether a person stopped under the circumstances at issue would feel that he was 'completely at the mercy of the police.'" United States v. Newton, 369 F.3d 659, 675 (2d Cir. 2004) (quoting Berkemer v. McCarty, 468 U.S. 420, 437-38 (1984)).  For Miranda purposes, "interrogation" includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980).

Here, the testimony presented at the suppression hearing fully supported the Appellate Division, Fourth Department's conclusion that Petitioner was not in custody at the time he made his initial statements to the police.  The record before this Court reveals that Petitioner was interviewed in a waiting room in the hospital. At the time of the interview, he was not under arrest, nor did the police tell Petitioner that he was under arrest.  Nor was Petitioner handcuffed or otherwise restrained in any way.  Notably, when the police first questioned Petitioner, the police and medical personnel were still trying to determine what had happened to Emily.  Under these circumstances, a reasonable person in Petitioner's situation would have believed that he was free to cease speaking with police and to leave.

Moreover, Petitioner voluntarily agreed to write down what happened on the morning of the incident.  After Petitioner did so, Chief Upchurch then advised Petitioner of his <u>Miranda</u> rights, and Petitioner voluntarily waived those rights, agreeing to speak with the police without an attorney.  It was during this conversation that Petitioner admitted injuring Emily.  T.T. 504-510.  That Petitioner was advised of his <u>Miranda</u> warnings by Chief Upchurch did not, by itself, convert the non-custodial interview into a custodial interrogation.  <u>See</u> <u>United States v. Bautista</u>, 145 F.3d 1140, 1148 (10th Cir. 1998) (<u>Miranda</u> warnings do not, in and of itself, create custodial interrogation, but are just one factor to

consider); <u>United States v. Charles</u>, 738 F.2d 686, 693 n.6 (5th Cir. 1984) ("Giving a suspect <u>Miranda</u> warnings in noncustodial setting does not . . . transform that setting into . . . a custodial interrogation for <u>Miranda</u> purposes."); <u>United States v. Lewis</u>, 556 F.2d 446, 449 (6th Cir.) (giving of <u>Miranda</u> rights does not restrain a suspect or convert a non-custodial interview into custodial interrogation), <u>cert. denied</u>, 434 U.S. 863 (1977).

Furthermore, Petitioner's conversation with Smith was also non-custodial and voluntary.  Petitioner and Smith had a close familial relationship and Smith -- acting in his unofficial capacity at the time he spoke with Petitioner -- called Petitioner on the telephone after the incident to warn him not to speak with police.  At no time during this telephone conversation were there any restrictions imposed on Petitioner.  At no point did Smith go to the hospital and meet with Petitioner face to face.  Petitioner spoke with Smith voluntarily and the entire conversation occurred over the telephone.  Additionally, the record reflects that Smith was reluctant to testify at trial against Petitioner and did so only because of the threat of being disciplined by the Sheriff's Department.  T.T. 533-534.

Finally, Petitioner's statements to child protective services caseworkers Mangini and Testa did not implicate Petitioner's right to counsel and privilege against self-incrimination because neither were law enforcement personnel nor were they working as agents of

-23-

the police when they spoke with Petitioner.  See People v. Whitmore, 12 A.D.3d 845 (3d Dep't 2004) ("generally social workers are not agents of the police") (quoting People v. Greene, 306 A.D.3d 639, 640-641 (3d Dep't 2003).  Other than arriving at the hospital together, the record reflects that the interviews by Chief Upchurch and Caseworker Mangini were conducted separately.  There is no evidence in the record that the police had any influence over Mangini's or Testa's interviews of Petitioner.  Thus, there was no basis for Petitioner's statements to these individuals to be suppressed as fruit of the poisonous tree.

Accordingly, the Court finds that the state court's adjudication of this claim was neither contrary to nor an unreasonable application of clearly settled Supreme Court law.  The claim is therefore dismissed in its entirety.

## 2.   Trial Court Improperly Refused to Give a Circumstantial Evidence Charge

Petitioner argues, as he did on direct appeal, that the trial court improperly refused to give a circumstantial evidence charge to the jury.  See Pet. ¶ 22, Ground Four; Supplemental Mem. of Law at 15-17; Reply at 6.  The Appellate Division, Fourth Department rejected this claim on the merits, finding that:

> the . . . contention of [Petitioner] that he was entitled to a circumstantial evidence charge is lacking in merit.  Because the statements that the court properly refused to suppress could be interpreted as relevant admissions of guilt . . ., there was both direct and circumstantial evidence, and the

> court therefore was not required to give a
> circumstantial evidence charge.

Mastownski, 26 A.D.3d at 746 (internal citations and quotations omitted).  As discussed below, this claim is not cognizable by this Court on habeas review.

It is well-settled that the propriety of a state court's jury instructions is generally a matter of state law that does not raise a federal constitutional question.  See Estelle v. McGuire, 502 U.S. 62, 71-72 (1991); Cupp v. Naughten, 414 U.S. 141, 146 (1973). Rather, to be entitled to habeas relief, a petitioner must show "not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." Cupp, 414 U.S. at 146.  The central question, therefore, is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." Id. at 147.

Here, Petitioner has not shown that he was entitled to a circumstantial evidence charge as a matter of state law.  Under New York law, "[w]henever a case relies wholly on circumstantial evidence to establish all elements of the charge, the jury should be instructed, in substance, that the evidence must establish guilt to a moral certainty." People v. Daddona, 81 N.Y.2d 990, 992 (1993).  Where, as here, there existed both direct and circumstantial evidence, "the court need not so charge the jury." Id.  Petitioner's admissions to the police and caseworkers was

-25-

direct evidence of his guilt.  The trial court therefore properly refused to issue a circumstantial evidence charge.  Petitioner has therefore failed to demonstrate an error of state law, let alone an error of federal constitutional dimension.

Petitioner's challenge to the trial court's jury charge does not rise to the level of a federal constitutional issue.  The state court's rejection of this claim then was not contrary to or an unreasonable application of settled Supreme Court law.  The claim is therefore dismissed.

## 3.   Prosecutorial Misconduct

Petitioner contends, as he did on direct appeal, that the prosecutor improperly bolstered a prosecution witness and made inflammatory comments at trial.  Specifically, he claims that: (1) it was improper for the prosecutor to bolster the testimony of Smith by stating that Smith failed to report Petitioner's confession because he was Petitioner's "brother"; and (2)  that the prosecutor committed misconduct on summation when he "thanked god," referred to Petitioner's expert witness as a "crook," denigrated defense counsel, and alleged that Petitioner made Emily sleep in a doll's bed.  See Pet. ¶ 22, Ground Three; Supplemental Mem. of Law at 11-15; Reply at 5-6.  The Appellate Division, Fourth Department rejected this claim, finding that Petitioner:

> failed to preserve for our review the majority
> of   his   contentions   concerning   alleged
> prosecutorial misconduct, and we decline to
> exercise our power to review them as a matter

> of discretion in the interest of justice.
> With respect to the instances of alleged
> prosecutorial misconduct that are preserved
> for our review, we conclude that the conduct
> of the prosecutor was not so egregious or
> prejudicial as to deny [Petitioner] his right
> to a fair trial.

Mastowski, 26 A.D.3d at 746 (internal citations and quotations

omitted).  As discussed below, this claim is meritless.

In reviewing a claim of prosecutorial misconduct with regard

to a writ of habeas corpus, the appropriate standard of review is

"a narrow one of due process, and not the broad exercise of

supervisory power." Floyd v. Meachum, 907 F.2d 347, 353 (2d Cir.

1990) (citing Darden v. Wainwright, 477 U.S. 168, 181 (1986)).  The

alleged prosecutorial misconduct must have caused the defendant

"substantial prejudice" so that it infected the entire trial with

fundamental unfairness and the resulting conviction was a denial of

due process. Donnelly v. DeChristoforo, 416 U.S. 637, 647 (1974);

see also, e.g., United States v. Shareef, 190 F.3d 71, 78

(2d Cir.1999).

Generally, inappropriate prosecutorial comments, standing

alone, are insufficient to reverse a conviction. United States v.

Young, 470 U.S. 1, 11 (1985).  In order to assess the impact of the

prosecutor's comments, the reviewing court must consider the

totality of the circumstances. Id. (noting that the court must

also review the defense counsel's summation to see if the defendant

"invited" such a response); Fero v. Kerby, 39 F.3d 1462, 1474

(10th Cir.1994) (noting that the court should "look first at the strength of the evidence against the defendant and decide whether the prosecutor's statements plausibly 'could have tipped the scales in favor of the prosecution'") (internal quotations omitted).  In the Second Circuit, this inquiry includes three factors: (1) the severity of the prosecutor's misconduct, (2) any curative measures taken by the court, and (3) the certainty of the conviction without the prosecutor's comments.  See e.g., United States v. Melendez, 57 F.3d 238, 241 (2d Cir. 1995) (citations omitted); Bentley v. Scully, 41 F.3d 818, 824 (2d Cir. 1994).

First, Petitioner contends that it was improper for the prosecutor to bolster the testimony of Smith by stating that Smith failed to report Petitioner's confession because he was Petitioner's "brother."  This contention is meritless.  The record reflects that, on direct examination, Smith testified that he and Petitioner were raised like "brothers."  T.T. 521-526.  On cross-examination, defense counsel sought to elicit testimony that Smith only testified against Petitioner after being threatened with disciplinary action by the Sheriff's Department.  T.T. 533-534.  In response to this testimony, the prosecutor properly rehabilitated Smith by confirming his close relationship to Petitioner and the feelings of loyalty that he had toward Petitioner.  T.T. 535.  The prosecutor's comment on summation, in which he referred to Smith as

Petitioner's "brother" was fair in light of the attack on Deputy Smith's credibility.  T.T. 1094.

Second, Petitioner contends that the prosecutor's summation comments regarding the defense expert, Buttram, were improper and denied him of a fair trial.  This contention is also meritless. The record before this Court reflects that said comments were fair in light of the evidence presented at trial and defense counsel's summation.  On summation, defense counsel suggested that the People's medical witnesses were merely guessing at the cause of Emily's injuries.  T.T. 1052-1060.  In response, the prosecutor criticized Buttram, whose credibility had been questioned on cross-examination, calling him a "crook" for over-billing medicare patients.  T.T. 1090.  Thus, the prosecutor's isolated comments were not improper and, even if they were, were not so egregious as to have deprived Petitioner of a fair trial.

Moreover, the prosecutor's brief statement "thanking god" for the well-qualified medical staff at Strong Memorial Hospital was not, as Petitioner contends, an invocation of religion, but rather a colloquial term used to praise the work of the medical staff who helped children like Emily with serious injuries.  T.T. 1081-1082. Thus, the prosecutor's isolated comment was not improper and, to the extent, if any, it may have been interpreted by the jury as a invocation of religion suggesting, as Petitioner argues, that "God was on the side of the prosecution," it was not so prejudicial as

to have deprived Petitioner of his right to a fair trial. <u>See</u>
Reply at 5.

Finally, there was strong evidence of Petitioner's guilt: the
medical evidence coupled with Petitioner's admissions squarely
pointed to the conclusion that Emily was violently shaken by
Petitioner.

Accordingly, the Court cannot find that the state court's
adjudication of this claim contravened or unreasonably applied
settled Supreme Court law. The claim is therefore dismissed in its
entirety.

**4. Depraved Indifference Element of First Degree Assault Statute is Unconstitutionally Void for Vagueness**

Petitioner argues, as he did on direct appeal, that the
depraved indifference element of the first-degree assault statute,
as stated in Penal Law § 120.10(3), is unconstitutionally vague.
<u>See</u> Pet. ¶ 22, Ground Five; Supplemental Mem. of Law at 17-21;
Reply at 6-7. The Appellate Division, Fourth Department rejected
this claim on a state procedural ground because it was unpreserved
for appellate review. <u>See</u> <u>Mastowski</u>, 26 A.D.3d at 745-746.
Consequently, this claim is procedurally defaulted from habeas
review by this Court.

A federal court may not review a question of federal law
decided by a state court if the state court's decision rested on a
state law ground that is independent of the federal question and
adequate to support the judgment. <u>See</u> <u>Coleman</u>, 501 U.S. at 729.

Here, the Ontario County court relied on New York's preservation rule (codified at CPL § 470.05(2)) to deny Petitioner's claim because it had not been properly preserved for appellate review. See Mastowski, 26 A.D.3d at 745-746.   The Second Circuit has determined that CPL § 470.05(2) is an independent and adequate state procedural ground.   See Garcia v. Lewis, 188 F.3d 71, 79-82 (2d Cir. 1999);   Velasquez v. Leonardo, 898 F.2d 7, 9 (2d Cir. 1990).   The Appellate Division, Fourth Department's reliance on New York's preservation rule is an adequate and independent state ground which precludes this Court's review of Petitioner's claim.

This Court, however, may reach the merits of Petitioner's claim, despite the procedural default, if he can demonstrate cause for the default and prejudice, or that failure to consider the claim will result in a fundamental miscarriage of justice.   See Coleman, 501 U.S. at 750.   Petitioner does not allege cause and prejudice for the default.   He does, however, attempt to avail himself of the "fundamental miscarriage of justice" exception, arguing that, "had he been tried under a proper and constitutional statute, he would not have been found guilty of assault."   Reply at 6-7.   The Supreme Court has explained that the fundamental miscarriage of justice exception is "tied . . . to [a] petitioner's innocence" and exists to protect those who are "actually innocent." Schlup v. Delo, 513 U.S. 298, 321, 324 (1995).   Because "'actual innocence' means factual innocence, not mere legal insufficiency,"

Bousley v. United States, 523 U.S. 614, 623-24 (1998), accord, e.g., Sweet v. Bennett, 353 F.3d 135, 142 (2d Cir. 2003); Dunham v. Travis, 313 F.3d 724, 730 (2d Cir. 2002), "prisoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" House v. Bell, 547 U.S. 518, 536-37 (2006); see also, e.g., Schlup, 513 U.S. at 324-27 (fundamental miscarriage of justice must be demonstrated by showing through "new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence - that was not presented at trial," that "it is more likely than not that no reasonable juror would have convicted him in light of the new evidence."); Murden v. Artuz, 497 F.3d 178, 194 (2d Cir. 2007) ("'To demonstrate actual innocence a habeas petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence.' Actual innocence requires 'not legal innocence but factual innocence.'") (citations omitted). Accordingly, the fundamental miscarriage of justice exception is "extremely rare" and should be applied only in "extraordinary case[s]." Schlup, 513 U.S. at 321-22; see also, e.g., Morrison v. Ercole, 07 Civ. 3576, 2009 U.S. Dist. LEXIS 7796, *20 (S.D.N.Y. Jan. 16, 2009) ("The Second Circuit has emphasized that the type of evidence on which claims of actual innocence may

be based is strictly limited and that petitioners must meet a 'demanding standard' in order to take advantage of this 'gateway.'"). Petitioner fails to meet the heavy burden required by Schlup and House insomuch as he does not claim to be entirely innocent of the crime with which he was charged. See e.g., Garbutt v. Conway, 05 Civ. 9898, 2009 U.S. Dist. LEXIS 70825, 2009 WL 2474099 at *2-3 (S.D.N.Y. Aug. 12, 2009) (petitioner failed to overcome the procedural bar because he made no "claim that he is entirely innocent."). Rather, he argues that the evidence was insufficient to prove the depraved indifference element of first degree assault. This argument, which is not rooted in a claim of factual innocence, amounts to nothing more than a legal sufficiency argument that is insufficient to invoke the fundamental miscarriage of justice exception. Moreover, Petitioner does not provide any new evidence or support for his generalized, conclusory assertion of innocence. See Reply at 6-7. Accordingly, Petitioner has failed to a make a "'colorable showing of factual innocence' in the form of newly adduced evidence." Burgos-Santos v. Greene, 05 Civ. 3763, 2009 U.S. Dist. LEXIS 55879, *6 (S.D.N.Y. July 1, 2009). Finally, the Court points out that the evidence was indeed legally sufficient to support Petitioner's conviction for depraved indifference assault (see discussion at Section "IV, 5"). This is hardly the extraordinary case, therefore, where "the principles of comity and finality that inform the concepts of cause and prejudice

'must yield to the imperative of correcting a fundamentally unjust incarceration.'" <u>Murray</u>, 477 U.S. at 495.  Because Petitioner has not demonstrated that a failure to consider the claim will result in a fundamental miscarriage of justice, the Court finds no basis to invoke this "extremely rare" exception to a procedural bar.  <u>See e.g.</u> <u>Lisojo v. Rock</u>, 09 Civ. 7928 (CM) (AJP), 2010 U.S. Dist. LEXIS 31152, *91-93 (S.D.N.Y. March 31, 2010), report & recommendation adopted by 2010 U.S. Dist. LEXIS 42262 (S.D.N.Y. April 29, 2010) (finding that petitioner failed to overcome procedural bar by attempting to invoke fundamental miscarriage of justice exception where Petitioner did not claim to be entirely innocent, but rather that the evidence was insufficient to convict him of depraved indifference murder).  Petitioner's claim is therefore procedurally defaulted and is dismissed on that basis.[2]

## 5.   **Legally Insufficient Evidence**

Petitioner contends, as he did in the state courts, that the evidence was legally insufficient to support his conviction for depraved indifference assault.   <u>See</u> Pet. ¶ 22, Ground Six; Supplemental Mem. of Law at 21-24; Reply at 7-8.   The Appellate

---

[2]

The Court notes that even if Petitioner was able to overcome the procedural default, his claim would still provide no basis for habeas relief.  Courts in this Circuit have upheld the constitutionality of New York's depraved indifference statute in rejecting claims of vagueness.  <u>See</u> <u>Farr v. Greiner</u>, 01-CV-6921 (NG) (MDG), 2007 U.S. Dist. LEXIS 30184, *83 (E.D.N.Y. Feb. 23, 2007), report & recommendation adopted by 2007 U.S. Dist. LEXIS 26401 (E.D.N.Y. April 10, 2007); <u>Guzman v. Greene</u>, 425 F. Supp. 2d 298, 320 (E.D.N.Y. 2006); <u>Salcedo v. Phillips</u>, No. 04 Civ. 7964, 2005 U.S. Dist. LEXIS 19808, *84-85 (S.D.N.Y. Sept. 13, 2005); <u>see also</u> <u>Mannix v. Philips</u>, 390 F.Supp.2d 280, 292 (S.D.N.Y. 2005).

Division, Fourth Department rejected this claim on the merits.[3]  As discussed below, this claim is meritless.

Under the clearly established law set forth in <u>Jackson v. Virginia</u>, 443 U.S. 307 (1979), a habeas petitioner "bears a very heavy burden" when challenging the legal sufficiency of his state criminal conviction, <u>Einaugler v. Supreme Court of the State of New York</u>, 109 F.3d 836, 840 (2d Cir. 1997) (quoting <u>Quirama v. Michele</u>, 983 F.2d 12, 14 (2d Cir. 1993)), and a habeas court is required to consider the trial evidence in the light most favorable to the prosecution and uphold the conviction if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."   <u>Jackson</u>, 443 U.S. at 319 (emphasis in original).

Moreover, a habeas court must defer to the assessments of the credibility of the witnesses that were made by the jury and may not substitute its view of the evidence for that of the jury. <u>Jackson</u>, 443 U.S. at 319; <u>Maldonado</u>, 86 F.3d at 35.  Thus, under this "rigorous standard," a "federal habeas corpus court faced with a record of historical facts that supports conflicting inferences

---

[3]

Petitioner raised this claim on direct appeal, and the Appellate Division, Fourth Department determined that, "[c[ontrary to further contentions of defendant, the conviction is supported by legally sufficient evidence and the verdict is not against the weight of the evidence." <u>Mastowski</u>, 26 A.D.3d at 746. Thereafter, Petitioner raised this claim in his first motion to vacate, and the claim was denied on procedural grounds, pursuant to CPL § 440.10(2)(a) and (c). <u>See</u> Resp't Ex. N.  Petitioner sought leave to appeal the county court's denial of his motion to vacate, which was granted. <u>See</u> Resp't Exs. P, R.  The Appellate Division, Fourth Department subsequently denied this claim on the merits.  <u>See</u> Resp't Ex. U.

must presume-even if it does not affirmatively appear in the record-that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." <u>Wheel v. Robinson</u>, 34 F.3d 60, 66 (2d Cir. 1994), <u>cert. denied</u>, 514 U.S. 1066 (1995) (quotation omitted).

When considering the sufficiency of the evidence of a state conviction, "[a] federal court must look to state law to determine the elements of the crime." <u>Ponnapula v. Spitzer</u>, 297 F.3d 172, 179 (2d Cir. 2002) (quoting <u>Quartararo v. Hanslmaier</u>, 186 F.3d 91, 97 (2d Cir. 1999), <u>cert. denied</u>, 528 U.S. 1170 (2000)).  Under New York law, "a person is guilty of assault in the first degree when [u]nder circumstances evincing a depraved indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes serious physical injury to another person."  Penal Law § 120.10(3).

**(A)  The Applicable Law for Legal-Insufficiency Analysis of Depraved Indifference**

Although the law on depraved indifference murder underwent significant changes from 2002 to 2006 (i.e., during the time of Petitioner's trial and subsequent conviction), the relevant law under which the insufficient evidence claim must be analyzed is the law at the time the conviction became final, not, as Petitioner asserts, the law at the time of his trial.

The Second Circuit has specifically held that, on habeas review, it is error to find that the applicable law for purposes of

a legal-insufficiency analysis is the law in effect when the petitioner was convicted at trial. <u>Rivera v. Cuomo</u>, 649 F.3d 132, 139 (2d Cir. 2011). Instead, the district court must apply the law as it existed at the time the petitioner's conviction became final. <u>id.</u> "For habeas purposes, a New York state-court conviction becomes final 90 days after the New York Court of Appeals denies leave to appeal, which is when the petitioner's time to apply for a writ of <u>certiorari</u> to the United State Supreme Court expires." <u>Id.</u> (citing <u>Fernandez v. Artuz</u>, 402 F.3d 111, 112 (2d Cir. 2005)); <u>see also</u> <u>Williams v. Artuz</u>, 237 F.3d 147, 150-51 (2d Cir. 2001).

Here, the New York Court of Appeals denied leave to appeal on April 26, 2006. <u>People v. Mastowski</u>, 6 N.Y.3d 850 (N.Y. 2006). Petitioner then filed a <u>pro</u> <u>se</u> motion for reconsideration on June 7, 2006, which was summarily denied by the Court of Appeals on August 4, 2006. <u>People v. Mastowski</u>, 7 N.Y.3d 815 (N.Y. 2006). At the time, N.Y. Court Rule § 500.11(g)(3), 22 N.Y. Comp. Rule & Reg. § 500.11(g)(3), provided that "[u]nless otherwise permitted by the court, the notice of motion [for reargument of appeals] shall be served not later than 30 days after the appeal or motion has been decided." Thus, Mastowski's motion for reconsideration appears to have been untimely, since it was filed more than 30 days after the issuance of the decision denying leave to appeal on April 26, 2006. Because the reconsideration motion was untimely, the 90-day period for seeking <u>certiorari</u> is added to the date the Court of Appeals denied leave to appeal (April 26, 2006), not to the date it denied the subsequent, untimely motion for reconsideration (August 4,

2006). see also Vega v. Bellnier, No. 10-CV-4202 (KAM), 2010 WL 4484377, at *1 (E.D.N.Y. Nov. 1, 2010) ("Petitioner's conviction became final either on or about May 5, 2009, 90 days after the New York Court of Appeals denied leave to appeal on February 4, 2009, or, if petitioner's motion for reconsideration was timely filed under state law, on or about July 13, 2009, 90 days after the New York Court of Appeals denied petitioner's motion to reconsider its denial of leave to appeal on April 14, 2009."). Thus, Petitioner's conviction became final on July 25, 2006, upon the expiration of the 90-day period for petitioning for a writ of certiorari from the Supreme Court. See, e.g., Rivera, 649 F.3d at 139 (citations omitted).

On July 5, 2006, the New York Court of Appeals decided People v. Feingold, 7 N.Y.3d 288, 293-94 (N.Y. July 5, 2006), which explicitly overruled People v. Register, 60 N.Y.2d 270 (N.Y. 1983), the depraved indifference standard in place at the time of Mastowski's trial. Rivera v. Cuomo instructs that the applicable law for this Court's purposes is People v. Feingold, 7 N.Y.3d at 293-94, not People v. Register, 60 N.Y.2d 270, since Feingold had already been decided by July 25, 2006, the date Mastowski's conviction became final. See Rivera, 649 F.3d at 139.

     Petitioner's conviction became final on July 25, 2006, upon the expiration of the 90-day period for petitioning for a writ of certiorari in the United States Supreme Court. See Williams v. Artuz, 237 F.3d 147, 150-51 (2d. Cir. 2001). Thus, the Court reviews Petitioner's sufficiency of the evidence claim under the

standard set forth in <u>People v. Feingold</u>, 7 N.Y.2d 288 (2006)(expressly overruling <u>People v. Register</u>, 60 N.Y.2d 270 (1983)).

**(B)   Legal Sufficiency of the Evidence**

Viewing the evidence in a light most favorable to the People, a rational trier of fact could have found the essential elements of depraved indifference assault beyond a reasonable doubt.  At trial, sufficient proof was presented which established the following: that the injuries inflicted upon Emily were consistent with those of shaken baby syndrome; that Emily suffered from retinal hemorrhages, a subdural hematoma, brain swelling, her extremities were stiff, and she was completely unresponsive; that, at the time of the trial, Emily remained in a vegetative state, unable to see or move on her own; that Petitioner confessed to Chief Upchurch, Deputy Smith, and caseworker Mangini that he had inflicted the injuries on Emily; that Petitioner failed to immediately respond to Emily's injuries; and that, despite having noticed something was wrong with Emily at 9:00 a.m., Petitioner waited until 12:00 p.m. when his wife returned home to take Emily to the hospital. T.T. 644, 674-675, 704-705, 934-935.  On such evidence, a rational jury could have concluded that, under circumstances evincing a depraved indifference to human life, Petitioner recklessly engaged in conduct which created a grave risk of death to his infant daughter, and thereby caused serious physical injury to her.  N.Y. Penal Law § 120.10(3);  <u>see</u> <u>People v. Griffin</u>, 48 A.D.2d 1233

(4th Dep't 2008) (evidence was sufficient to establish depraved indifference murder where defendant, who was frustrated with three-year-old daughter who suffered from cerebral palsy, "slammed her and threw her on the couch about four or five times," causing child to hit her heard on armrest and couch and subsequently die of subdural hematoma caused by blunt force trauma); People v. Smith, 41 A.D.3d 964 (3d Dep't 2007) (evidence was legally sufficient to prove defendant acted with depraved indifference where defendant violently shook three-year-old child causing her death); People v. Maddox, 31 A.D.3d 970 (3d Dep't 2006) (affirming defendant's conviction of depraved indifference murder where defendant shook four-month-old infant causing her death).

Accordingly, the Court finds that the state court's adjudication of this claim did not contravene or unreasonably apply settled Supreme Court law. Petitioner's sufficiency of the evidence claim is therefore dismissed in its entirety.

## 6. Ineffective Assistance of Counsel

Petitioner argues that he was denied the effective assistance of trial counsel. Specifically, he contends that trial counsel failed to: (1) investigate and prepare his expert witness; (2) object to and preserve state and federal constitutional violations; (3) request a Frye hearing to determine the reliability of the state's expert witnesses; (4) object and preserve the Petitioner's right to confrontation; (5) object to inflammatory and bolstering testimony; and (6) remain apprised of

the legal definition of "depraved indifference." See Pet. ¶ 22, Ground Two; Supplemental Mem. of Law at 5-11; Reply at 3-5. Petitioner raised the first portion of this claim on direct appeal, and it was rejected on the merits. See Mastowski, 26 A.D.3d at 745. The remaining portions of Petitioner's claim were raised in his post-conviction CPL § 440.10 motions, and denied on procedural grounds.[4]   Consequently, as discussed below, Petitioner's ineffective assistance of trial counsel claim is partially meritless and partially procedurally defaulted from habeas review.

### (A)   Petitioner's Claim that Trial Counsel's Failed to Investigate and Prepare Expert Witness is Meritless

Petitioner argues, as he did on direct appeal, that trial counsel was ineffective because he failed to investigate and prepare his expert witness (Buttram).   The Appellate Division, Fourth Department rejected this claim on the merits, finding that "defense counsel had a discernable strategy in advancing expert testimony that the victim's injuries could have been caused by recent vaccinations and although that strategy was not successful, [Petitioner] was not thereby deprived of the effective assistance of counsel." Mastowski, 26 A.D.3d at 745.   As discussed below, this claim is meritless.

---

[4]   The Court notes that Petitioner's first motion to vacate was denied, in its entirety, in procedural grounds.  See Resp't Ex. L.  Petitioner sought leave to appeal the county court's denial, which was granted.  See Resp't Ex. R.  The Appellate Division, Fourth Department subsequently denied each of the remaining portions of Petitioner's ineffective assistance of counsel claim on procedural grounds.  See Resp't Ex. U.

To establish that he was deprived of his Sixth Amendment right to the effective assistance of trial counsel, a petitioner must show that (1) his attorney's performance was deficient, and that (2) this deficient performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 687 (1984). Deficiency is measured by an objective standard of reasonableness, and prejudice is demonstrated by a showing of a "reasonable probability" that, but for counsel's unprofessional errors, the result of the trial would have been different. Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding." Id. To succeed, a petitioner challenging counsel's representation must overcome a "strong presumption that [his attorney's] conduct falls within the wide range of reasonable professional assistance." Id. at 689. A reviewing court must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Id.

Petitioner argues that he received ineffective assistance of trial counsel because counsel failed to investigate and prepare his expert witness (Buttram). This claim is meritless. "'The decision to call an expert witness is a strategic decision for the defense counsel, and generally should be not be disturbed." See Mazique v. Ercole, 06-cv-1723, 2008 U.S. Dist. LEXIS 56660, *25 (E.D.N.Y. July 23, 2008) (citing United States v. Nersesian, 824 F.2d 1294, 1321 (2d Cir. 1987). Here, counsel was hard-pressed to find an alternate cause for Emily's injuries. Although Buttram may not

have been an ideal witness -- given his questionable credentials and reputation in the medical community which were revealed on cross-examination -- Petitioner cannot show prejudice as a result of counsel's decision to call him as an expert witness.  That is, Buttram conveyed the view to the jury that Emily's injuries could have been caused from something other than shaken baby syndrome. Notably, Buttram's testimony buttressed Petitioner's testimony about Emily's negative reaction to the vaccinations she received prior to the date of the incident.  To this extent, Petitioner has not and cannot demonstrate that counsel's performance was constitutionally deficient within the meaning of Strickland, and that, but for counsel's alleged error, there is a probability -- let alone a reasonable one -- that the outcome of his trial would have been different.

Further, to the extent Petitioner specifically faults trial counsel for failing to investigate and prepare Buttram, such a claim is also meritless.  There is nothing in the record before this Court that suggests that defense counsel was unaware of his expert witness's questionable credentials and reputation in the medical community.  Indeed, as Respondent correctly points out, given the facts and circumstances of the case, counsel may have indeed been well-aware of the weaknesses of his expert, but could not find an expert witness with better credentials who would have offered testimony to support Petitioner's defense.  See Resp't Mem. of Law at 34.  In any event, Petitioner makes no showing of prejudice as a result of counsel's alleged error.

Accordingly, the Court cannot find that the state court's adjudication of this claim contravened or unreasonably applied Strickland. This portion of Petitioner's ineffective assistance of counsel claim is therefore dismissed as meritless.

**(B)   The Remaining Portions of Petitioner's Ineffective Assistance of Trial Counsel Claim are Procedurally Defaulted**

Petitioner asserts that trial counsel was ineffective because counsel failed to:  object to and preserve state and federal constitutional violations;  request a Frye hearing to determine the reliability of the state's expert witnesses;  object and preserve the Petitioner's right to confrontation;  object to inflammatory and bolstering testimony;  and remain apprised of the legal definition of "depraved indifference."  These claims were raised in Petitioner's post-conviction motions for vacatur and were ultimately denied, on procedural grounds, pursuant to CPL § 440.10(2) and (c).  See Resp't Exs. L, U.  Consequently, they are procedurally barred from habeas review by this Court.

As discussed above, a federal court may not review a question of federal law decided by a state court if the state court's decision rested on a state law ground that is independent of the federal question and adequate to support the judgment.  See Coleman, 501 U.S. at 729.  Here, the state court rejected these portions of Petitioner's ineffective assistance of trial counsel claims pursuant to CPL § 440.10(2)(a), (c).  The Second Circuit has recognized CPL § 440.10(2)(c) as an adequate and independent state

ground sufficient to preclude federal habeas review of a state-court defendant's claims. See e.g., Sweet v. Bennett, 353 F.3d 135, 139-40 (2d Cir. 2003); Reyes v. Keane, 118 F.3d 136, 139 (2d Cir. 1997); Aparicio, 269 F.3d at 91 (2d Cir. 1991). Additionally, denial of a claim pursuant CPL § 440.10(2)(a) has been found to constitute an adequate and independent state ground. See, e.g., McClarin v. Smith, 05-CV-2478 (DLI), 2007 U.S. Dist. LEXIS 58717 (E.D.N.Y. 2007); D'Alessandro v. Fischer, No. 01 Civ. 2551 (LTS)(DF), 2005 U.S. Dist. LEXIS 31381 (S.D.N.Y. 2005). Accordingly, the state court's reliance on CPL § 440.10(2)(a), (c) to deny the remaining portions of Petitioner's ineffective claim bars this Court's review of them.

A finding of procedural default bars habeas review of the federal claims unless the petitioner can show cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the claims will result in a miscarriage of justice. Murray, 477 U.S. at 492. Petitioner does not specifically allege cause and prejudice to overcome the procedural default, nor has he attempted to avail himself of the fundamental miscarriage of justice exception. Accordingly, the remaining portions of Petitioner's ineffective assistance of counsel claim are procedurally defaulted and dismissed on that basis.

In any event, even if Petitioner was able to overcome the procedural default, the remaining portions of Petitioner's ineffective assistance of counsel claim are meritless. First, Petitioner faults counsel for failing to preserve the suppression

issue, the challenge to the depraved indifference jury instruction, and the claims of prosecutorial misconduct.  As discussed in other sections of this Decision and Order, Petitioner's claims that his statements should have been suppressed, that the depraved indifference statute was unconstitutionally vague, and that the prosecutor committed misconduct are all without merit.  Thus, trial counsel was not ineffective for failing to object to these meritlesss issues, and Petitioner has not demonstrated that he was prejudiced by counsel's failure to do so.  This portion of Petitioner's ineffective assistance of counsel claim is therefore meritless.

Next, Petitioner faults counsel for failing to request a <u>Frye</u> hearing.  In New York, "expert testimony based on scientific principles or procedures is admissible only after a principle or procedure has 'gained general acceptance' in its specified field." <u>See</u> <u>People v. Wesley</u>, 83 N.Y.2d 417, 422 (1994) (citing <u>Frye v. United States</u>, 293 F. 1013 (D.C. Cir. 1923).  However, a <u>Frye</u> hearing is not required where the expert testimony offered does not involve any novel procedures or innovative scientific theories. <u>See</u> <u>People v. Garrow</u>, 75 A.D.3d 849, 852 (3d Dep't 2010).  Thus, where a scientific theory is well-established, the failure to request a <u>Frye</u> hearing will not amount to ineffective assistance of counsel. <u>See</u> <u>Gersten v. Senkowski</u>, 299 F.Supp.2d 84, 105 (E.D.N.Y. 2004) ("In light of the well-established law in New York, the decision not to request a <u>Frye</u> hearing was a reasonable strategy that falls well within the realm of competent representation.").

New York courts have held that shaken baby syndrome is no longer a scientific theory.  See In re Antoine J., 185 A.D.2d 925, 926 (2d Dep't 1992); People v. Yates, 290 A.D.2d 888, 890 (3d Dep't 2002).  To this extent, it was not unreasonable for trial counsel not to have sought a Frye hearing.  Petitioner contends that the effect of vaccinations on a baby, in comparison to the effects of shaken baby syndrome, are novel, and should have been subject to a Frye hearing.  Petitioner cites no authority for this position, and, in any event, has not alleged prejudice as a result of counsel's failure to request a Frye hearing.  This portion of Petitioner's ineffective assistance of counsel claim is therefore meritless.

Petitioner also contends that counsel was ineffective for failing to object to Dr. Powers' testimony that she had consulted with other experts.  Petitioner asserts that he had a right to confront these "other experts" and thus his right to confront witnesses was violated.  This claim is meritless.  The record reflects that Dr. Powers testified extensively regarding Emily's injuries and opined that they were consistent with shaken baby syndrome.  Moreover, Nurse Mellor-Conley, Dr. O'Hanlon, and Dr. Connelly all testified that Emily's injuries were likely the result of shaken baby syndrome.  To this extent, it is highly unlikely that Petitioner was prejudiced by counsel's failure to object to Dr. Power's statements regarding the "other experts."  In any event, the testimony of these "other experts" would have only served to harm Petitioner's case because they apparently supported

the opinion that Emily had been shaken.  And, even assuming counsel erred in failing to object to the statements, Petitioner has not demonstrated prejudice in light of the overwhelming testimony suggesting shaken baby syndrome as the cause of Emily's injuries. His generalized assertion that "the Appellate Division could not have known the amount of prejudice suffered by the Petitioner as a result of being unable to cross-examine said individuals" is insufficient to establish prejudice.  This portion of Petitioner's ineffective assistance of counsel claim is therefore meritless.

Finally, Petitioner's claims regarding counsel's failure to object to misconduct by the prosecutor and counsel's failure to remain apprised of the definition of depraved indifference are both meritless (see discussions above).  Thus, counsel's performance in these respects was not constitutionally deficient within the meaning of Strickland, and these portions of Petitioner's ineffective assistance of trial counsel claim are therefore meritless.

In sum, the remaining portions of Petitioner's ineffective assistance of counsel claim are procedurally defaulted and are dismissed on that basis.  In any event, even if Petitioner was able to overcome the procedural bar, the remaining portions of his ineffective assistance of counsel claim still lack merit.

**7.   Harsh and Excessive Sentence**

Petitioner contends, as he did on direct appeal,[5] that his sentence of seventeen years imprisonment, plus five years of post release supervision, is harsh and excessive. <u>See</u> Pet. ¶ 22 Ground Seven.  The Appellate Division, Fourth Department rejected this claim on the merits, finding that, "the sentence is not unduly harsh or severe.  Contrary to the contention of defendant, the fact that the sentence imposed after trial was greater than that offered pursuant to the pretrial plea offer does not render the sentence unduly harsh." <u>Mastowski</u>, 26 A.D.3d at 746.  As discussed below, this claim is not cognizable by this Court on habeas review.

It is well-settled that a habeas petitioner's challenge to the length of his or her prison term does not present a cognizable constitutional issue if the sentence falls within the statutory range.  <u>Townsend v. Burke</u>, 334 U.S. 736, 741 (1948) ("The [petitioner's] sentence being within the limits set by the statute, its severity would not be grounds for relief here even on direct review of the conviction, much less on review of the state court's denial of habeas corpus."); <u>White v. Keane</u>, 969 F.2d 1381, 1383 (2d Cir. 1992) ("No federal constitutional issue is presented where . . . the sentence is within the range prescribed by state law.")

---

[5]

The Court notes that the parties dispute whether this claim is exhausted. Respondent contends that the claim is unexhausted because "it pertains only to matters of state law and [P]etitioner failed to raise it in constitutional terms" on direct appeal, thereby failing to apprise the appellate court of the federal constitutional dimension of the claim.  Resp't Mem. of Law at 53.  Petitioner counters, arguing that the "issue is based upon a claim that the sentence is harsh and excessive . . . [and] that such terminology is at the heart of any Eighth Amendment claim."  Reply at 9.  The Court declines to address the exhaustion issue to the extent that a harsh and excessive sentencing claim is not cognizable on habeas review where, as here, Petitioner's sentence falls within the statutory range.

(citing <u>Underwood v. Kelly</u>, 692 F.Supp. 146 (E.D.N.Y. 1988), <u>aff'd mem.</u>, 875 F.2d 857 (2d Cir. 1989)); <u>accord</u> <u>Ross v. Gavin</u>, 101 F.3d 687 (2d Cir. 1996) (unpublished opinion).  Because Petitioner's sentence falls within the permissible statutory range, he may not challenge the length of the sentence in the instant proceeding.

Here, Petitioner was sentenced to a determinate term of seventeen years imprisonment on the first-degree assault conviction (a Class B felony).  S.M. 20.  This sentence falls within the statutory range under New York law.  <u>See</u> Penal Law §§ 120.10(3), 70.02.  Accordingly, Petitioner's claim that his sentence was harsh and excessive is not cognizable, and is dismissed on that basis.

**V.   Conclusion**

For the reasons stated above, the petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Dkt. No. 1) is denied, and the petition is dismissed.  Because Petitioner has failed to make "a substantial showing of a denial of a constitutional right," 28 U.S.C. § 2253(c)(2), the Court declines to issue a certificate of appealability. <u>See, e.g.</u>, <u>Lucidore v. New York State Div. of Parole</u>, 209 F.3d 107, 111-113 (2d Cir. 2000).  The Court also hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this judgment would not be taken in good faith and therefore denies leave to appeal as a poor person.  <u>Coppedge v. United States</u>, 369 U.S. 438 (1962).

Petitioner must file any notice of appeal with the Clerk's Office, United States District Court, Western District of New York, within thirty (30) days of the date of judgment in this action.

Requests to proceed on appeal as a poor person must be filed with United States Court of Appeals for the Second Circuit in accordance with the requirements of Rule 24 of the Federal Rules of Appellate Procedure.

**IT IS SO ORDERED.**

S/Michael A. Telesca

_____

HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:     October 18, 2011
           Rochester, New York